SIGMA CORPORATION, U.V. International, Southern Star, Inc., City Pipe and Foundry, Inc., Long Beach Iron Works, Overseas Trade Corporation, D & L Supply Co., Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Division, Virginia Industries Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry Inc., Tyler Pipe Industries Inc., U.S. Foundry & Manufacturing Co. and Vulcan Foundry, Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

D & L Supply Co., Defendant–Intervenor,

Deeter Foundry, Inc., et al.,
Defendants–Intervenors.

Court No. 91–02–00154.
Slip Op. 93–230.

United States Court of
International Trade.

Dec. 8, 1993.

Willkie Farr & Gallagher, Walter J. Spak, Christopher A. Dunn, Theodore C. Whitehouse and Christopher S. Stokes, for plaintiffs Sigma Corp., U.V. Intern., Southern Star, Inc., City Pipe and Foundry, Inc. and Long Beach Iron Works.

Mudge Rose Guthrie Alexander & Ferdon, N. David Palmeter, Jeffrey S. Neeley, Martin J. Lewin, Richard G. King and Renee O'Brien, for plaintiff Overseas Trade Corp.

Whitman & Ransom, Dennis James, Jr. and Kathleen F. Patterson, for plaintiff D & L Supply Co.

Collier, Shannon, Rill & Scott, Paul C. Rosenthal, Mary T. Staley and Robin H. Gilbert, for plaintiffs Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Div., Virginia Industries Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry Inc., Tyler Pipe Industries Inc., U.S. Foundry & Mfg. Co. and Vulcan Foundry, Inc.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis and Paul Herrup; (Jeffery C. Lowe and Robert J. Heilferty, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

Whitman & Ransom, Dennis James, Jr. and Kathleen F. Patterson, for defendant-intervenor D & L Supply Co.

Collier, Shannon, Rill & Scott, Paul C. Rosenthal, Mary T. Staley and Robin H. Gilbert, for defendant-intervenors Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Division, Virginia Industries Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry Inc., Tyler Pipe Industries Inc., U.S. Foundry & Mfg. Co. and Vulcan Foundry, Inc.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Sigma Corporation, *et al.*, move pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record contesting the Department of Commerce, International Trade Administration's ("Commerce") Final Results in *Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 56 Fed.Reg. 2,742 (1991).

On May 13, 1985, the Municipal Castings Fair Trade Council ("MCFTC") and fifteen individual United States companies filed a petition with Commerce alleging that imports of iron construction castings were being sold at less than fair value in the United States. *Certain Iron Construction Castings From the People's Republic of China; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 9,483 (1986). In response to this petition, Commerce conducted an antidumping investigation which resulted in the issuance of an antidumping duty order on iron construction castings from the People's Republic of China. *Antidumping Duty Order; Iron Construction Castings From the People's Republic of China (the PRC),* 51 Fed.Reg. 17,222 (1986).

On June 29, 1988, Commerce issued a notice of initiation of an administrative review for the period May 1, 1987 through April 30, 1988. *Initiation of Antidumping and Countervailing Duty Administrative Reviews* ("*1987–88 Initiation*"), 53 Fed.Reg. 24,470 (1988). On June 21, 1989, Commerce likewise issued a notice for the period from May 1, 1988 through April 30, 1989. *Initiation of Antidumping and Countervailing Duty Administrative Reviews* ("*1988–89 Initiation*"), 54 Fed.Reg. 26,069 (1989). Commerce subsequently consolidated these two reviews and issued its preliminary results on June 5, 1990. *Iron Construction Castings From the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review* ("*Preliminary Results*"), 55 Fed.Reg. 22,939 (1990). The Final Results were issued on January 24, 1991. *Final Results,* 56 Fed.Reg. at 2,742. Oral Argument was heard in this case on July 20, 1993.

The administrative review at issue in this case covers the periods from May 1, 1987 through April 30, 1988 and May 1, 1988 through April 30, 1989. *Id.* Specifically, plaintiffs contest Commerce's (1) use of the Philippines as a surrogate country for determining foreign market value; (2) use of Philippine import statistics as a surrogate for imports used in the People's Republic of China; (3) failure to determine whether the construction castings industry is market-oriented; (4) failure to institute reviews for China National Machinery Import and Export Corporation, Liaoning ("MACHIMPEX Liaoning"), and use of "best information available" for MACHIMPEX Liaoning as a non-responsive company for determining foreign market value; (5) setting of one dumping margin for all Chinese companies and failing to give Guangdong Metals and Minerals Import & Export Corporation ("Guangdong Minmetals") a separate company-specific dumping margin; (6) failure to give Guangdong notice or opportunity for comment on Commerce's change from a separate rate in the Preliminary Results to a country-wide rate in the Final Results; (7) adjustments for Guangdong's constructed value for "after sale" warehousing costs; (8) depreciation estimate as the "best information available"; (9) valuation of different material inputs using different valuation sources; (10) failure to include all costs incurred by Chinese producers to manufacture castings specifically with regard to accounting of (a) special features and bolts, (b) labor costs incurred by Chinese producers, and (c) overhead costs; (11) treatment of foreign inland freight costs incurred in transporting material inputs to the foundries; (12) failure to investigate whether Chinese castings producers were reimbursing U.S. importers of Chinese castings for antidumping duties; and (13) various clerical errors including (a) improperly calculating the amount of aluminum consumed in production, (b) the amount of fireclay consumed, and (c) failing to properly calculate the raw material factors that were valued using petitioners' additives and supply data.

### Discussion

In reviewing a final determination of Commerce, this Court must uphold that determi-

nation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir. 1990).

1. *Use of Philippines as Surrogate Country*

■ Plaintiffs, Sigma Corporation, U.V. International, Southern Star, Inc., City Pipe and Foundry, Inc. and Long Beach Iron Works ("Sigma"), claim that Commerce's use of the Philippines as the surrogate country for a non-market economy was unsupported by substantial evidence on the record and not in accordance with law. *Sigma's Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record ("Sigma's Memorandum")* at 5.

Defendant claims that the decision to employ the Philippines as a surrogate country was properly made based on the criteria outlined in the statute and the failure of the parties to provide information establishing that the Philippines was not an appropriate surrogate. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Administrative Record ("Defendant's Memorandum")* at 47–48.

According to 19 U.S.C. § 1677b(c)(2) (1988 & Supp.1993):

If the administering authority finds that the available information is inadequate for purposes of determining the foreign market value of merchandise . . . the administering authority shall determine the foreign market value on the basis of the price at which merchandise that is—

(A) comparable to the merchandise under investigation, and

(B) produced in one or more market economy countries that are at a level of economic development comparable to that of the non-market economy country, [whose merchandise]

is sold in other countries, including the United States.[1]

Thus, in this case the Philippines was chosen as the appropriate surrogate country. Plaintiffs claim that there is no evidence on the record indicating that the Philippines is an appropriate surrogate country and, furthermore, that Commerce did not fully investigate other potential surrogates. *Sigma's Memorandum* at 5–6. Contrary to plaintiffs' contentions, however, Commerce attempted to identify producers and/or exporters of iron construction castings in several countries including India, Indonesia, Pakistan, the Philippines, Sri Lanka, Bolivia, Jamaica, Morocco, Zambia, and Zimbabwe, countries which were considered comparable to the People's Republic of China in stage of economic development. *See Preliminary Results*, 55 Fed. Reg. at 22,940; *see also* Administrative Record ("AR") (Pub.) Docs. 15, 39, 40, 44, 45, 46. Commerce tried to obtain information from all these potential surrogates, but Commerce received no responses to these requests for information. *See Preliminary Results*, 55 Fed.Reg. at 22,940; *see also* AR (Pub.) Docs. 15, 39, 40, 44, 45, 46. Thus, Commerce relied on the Philippines because it was a country at a comparable level of development to China for which Commerce located adequate information. *Preliminary Results*, 55 Fed. Reg. at 22,940.

This Court has previously stated that Commerce is not required to use the surrogate with the most comparable economy; it

---

**1.** 19 C.F.R. § 353.8(b)(1) (1988) states: Comparability of economic development shall be determined from generally recognized criteria, including per capita gross national product and infrastructure development (particularly in the industry producing such or similar merchandise).

is only required to use a surrogate with a comparable economy. *See Tehnoimportexport and Peer Bearing Co. v. United States,* 15 CIT 250, 256, 766 F.Supp. 1169, 1175 (1991). The Court "will not impose its choice of which economy is more comparable ... provided the choice made by Commerce is sufficiently reasonable and supported by the evidence." *Id.* at 255, 766 F.Supp. at 1175.

The Philippines has been used as a surrogate for the People's Republic of China in the past. *See, e.g., Preliminary Determination of Sales at Less Than Fair Value; Certain Headwear From the People's Republic of China,* 53 Fed.Reg. 45,138, 45,141 (1988). Moreover, plaintiffs have not set forth any concrete evidence why the Philippines should not be selected as a surrogate country in this case.

Plaintiffs also claim that Commerce did not provide notice or opportunity for them to comment on the selection of the Philippines as a surrogate country until after the preliminary determination. *Sigma's Memorandum* at 6. In support of their claim, Sigma cites a letter issued by Commerce in another investigation. *See Sigma's Memorandum,* Appendix 1, *Antidumping Duty Investigation of Certain Compact Ductile Iron Waterworks (CDIW) Fittings and Accessories Thereof from the People's Republic of China ("Waterworks Fittings ").* The letter stated: "[W]e are providing you with the opportunity to submit any [publicly available published information] which you feel the Department should consider using to value factors of production in this investigation." *Id.* This letter, however, did not specifically request comment on the choice of surrogate country as plaintiffs allude.

Nevertheless, in this case, prior to the issuance of the preliminary results, Commerce similarly solicited comments from interested parties on the method for valuing factors of production. Therefore, Sigma is mistaken by insinuating that Commerce provided disparate treatment to parties in *Waterworks Fittings* and the case at hand.

Thus, since Commerce's selection was reasonable, this Court deems that Commerce properly selected the Philippines as a surro-

gate country and, therefore, Commerce's selection is hereby affirmed.

### 2. *Import Statistics*

■ Sigma also contests Commerce's use of Philippine import statistics as a surrogate for the particular imports used in the People's Republic of China claiming that it distorted the calculation of foreign market value. *Sigma's Memorandum* at 8. Sigma claims that using import statistics does not reflect the market forces in the construction castings industry in the People's Republic of China because the import categories include materials that are used in the construction castings industry. *Id.* at 8–10.

In the Final Results, Commerce determined that it valued certain of "the Chinese factors of production using publicly available statistical sources." *Final Results,* 56 Fed. Reg. at 2,743. Commerce has had difficulty acquiring such data on other occasions and in those instances the Court has affirmed Commerce's use of import statistics. *See Tehnoimportexport,* 15 CIT at 255–56, 766 F.Supp. at 1176; *see also Tehnoimportexport, UCF America Inc. v. United States,* 16 CIT ——, 783 F.Supp. 1401 (1992). Furthermore, "[t]here is no statutory or case law stating that import [statistics] cannot be used." *Tehnoimportexport,* 16 CIT at ——, 783 F.Supp. at 1405.

In this case, Commerce rejected Sigma's claim stating in the Final Results that it was

> satisfied that the official import statistics of the Philippines are reasonable measures of the factor values in the PRC. We were able to accurately identify imports of virtually every material used to produce iron construction castings during each period covered by these administrative reviews. These statistics represent the official trade statistics of the Philippine government. The commodity classification system follows the Standard International Trade Classification of the United Nations, a well-respected and widely-used product classification system.
>
> With respect to the price fluctuations within each category, we note that the import prices we used are weighted-average figures calculated on an annual basis.

This averaging of import prices reduces the effects of any price fluctuations which may occur.

*Final Results,* 56 Fed.Reg. at 2,745.

Thus, Commerce's selection of import statistics was clearly substantiated on the record and its decision was more than reasonable. Therefore, its determination as to this issue is affirmed.

### 3. *Market-Oriented Industry*

█ Sigma also claims that Commerce failed to determine whether the construction castings industry in the People's Republic of China is market-oriented and, furthermore, that this case should be remanded to Commerce so that it can determine whether the construction castings industry in the People's Republic of China is market-oriented. *Sigma's Memorandum* at 10–12.

Defendant and defendant-intervenors, Deeter Foundry, *et al.,* claim that Sigma failed to exhaust its administrative remedies regarding this issue and, therefore, cannot bring this issue up now. *Defendant's Memorandum* at 46; *Defendants–Intervenors' [Deeter Foundry, et al.] Response in Opposition to Sigma's Motion and Guangdong Minmetals' Motion for Judgment Upon the Agency Record* at 21–24. The court has stated that "[a] litigant may not raise an issue for the first time on appeal." *See Cemex, S.A. v. United States,* 16 CIT ——, ——, 790 F.Supp. 290, 296 (1992); *see also Wieland Werke, AG v. United States,* 13 CIT 561, 567, 718 F.Supp. 50, 55 (1989). The court "usurps the agency's function when it sets aside a determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Wieland Werke,* 13 CIT at 567, 718 F.Supp. at 55; *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

In the underlying proceeding, Sigma never contended that the castings industry was market-oriented and, therefore, Commerce did not have the opportunity to consider the merits of this claim or seek any factual information.

The court has recognized several exceptions to the exhaustion requirement. For example, if a party does not have access to the confidential record or it would be futile to raise an argument at the administrative level, then a plaintiff is not required to exhaust its administrative remedies. *See Budd Co. Wheel & Brake Div. v. United States,* 15 CIT 446, 452–53, 773 F.Supp. 1549, 1554–55 (1991); *see also Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 583 F.Supp. 607 (1984). In this case, however, plaintiffs do not even address the issue of exhausting administrative remedies and its exceptions, nor do any of the exceptions apply. *Sigma's Memorandum* at 10; *Reply of Plaintiffs Sigma Corporation, et al., to Oppositions to Motion for Judgment on the Agency Record* at 1–3. Thus, the Court is not in a position to entertain plaintiffs' arguments at this time as plaintiffs have failed to exhaust their administrative remedies on this issue and, therefore, this Court denies Sigma's motion to remand this case to Commerce so that it can determine whether the construction castings industry in the People's Republic of China is market-oriented.

### 4. *Exclusion of Liaoning*

█ Plaintiff Overseas Trade Corporation ("Overseas") is an American owned company located in Seattle, Washington. During the periods of review in question in this case, Overseas purchased iron construction castings from one Chinese company, China National Machinery Import and Export Corporation ("MACHIMPEX"), Liaoning. Overseas claims that Commerce's failure to name MACHIMPEX Liaoning in its requests for reviews and its failure to institute reviews for that company was unsupported by substantial evidence. *Plaintiff Overseas Trade Corporation's Brief in Support of its Motion for Judgment Upon the Agency Record ("Overseas Brief")* at 12–13.

Overseas claims that during the periods of review, MACHIMPEX Liaoning was a separate and distinct company from other companies bearing the MACHIMPEX name. Indeed, at one time, Liaoning was connected with the national headquarters in Beijing,

but Overseas contends that this is no longer the case.

On May 26, 1988, counsel for the MCFTC requested Commerce to institute an administrative review of certain companies for the 1987–88 review period. AR (Pub.) Doc. 2. In its subsequent notice of initiation of anti-dumping and countervailing duty administrative reviews, Commerce named the companies it was reviewing including MACHIM-PEX and Minmetals Beijing. *1987–88 Initiation*, 53 Fed.Reg. 24,471. On July 26, 1988, Commerce directed the sending of questionnaires to several firms including MACHIM-PEX, Beijing. AR (Pub.) Doc. 10. No such questionnaire was sent to MACHIMPEX, Liaoning.

On October 4, 1988, counsel for MCFTC filed a letter with Commerce to clarify the exact companies that were to be reviewed. AR (Pub.) Doc. 29. The letter specifically requested clarification regarding Minmetals and not MACHIMPEX. The letter objected to Commerce's serving questionnaires only upon the Beijing and Guangdong branches of Minmetals and not on any of the other Minmetals companies. The letter stated that the request for review "was not limited to any particular branch of Minmetals, but identified the whole corporate entity." This request was based on the understanding that five branches of Minmetals were engaged in the export of the subject merchandise to the United States. *Id.* at 2. No such clarification was requested or made regarding MA-CHIMPEX.

On May 31, 1989, the MCFTC similarly requested an administrative review for the 1988–89 review of eight specific companies including the Beijing branch of Minmetals, the Guangdong branch of Minmetals, the Liaoning branch of Minmetals, the Jilin branch of Minmetals, the Anhui branch of Minmetals, and MACHIMPEX. MACHIM-PEX Liaoning was not specifically mentioned. AR (Pub.) Doc. 59. On June 21, 1989, Commerce subsequently published its notice of initiation of the antidumping and countervailing duty administrative review in the Federal Register listing each of the above companies, but not MACHIMPEX Liaoning. *1988–89 Initiation*, 54 Fed.Reg. at 26,069. On June 26, 1989, Commerce sent a questionnaire to MACHIMPEX, but none was sent to MACHIMPEX Liaoning.

On June 5, 1990, Commerce published its Preliminary Results for both review periods for iron construction castings from the People's Republic of China. *Preliminary Results*, 55 Fed.Reg. 22,939. Commerce calculated a dumping margin of 47.54% for the 1987–88 period and 97.57% for the 1988–89 period based on "best information available" and stated that it applied to "all unnamed branches of those corporations." *Id.*

Plaintiff Overseas now claims that MA-CHIMPEX Liaoning cannot be subject to these rates since it was a separate company from MACHIMPEX. Overseas claims that Liaoning was not identified as a respondent by petitioner, did not have reviews instituted against it and did not receive a questionnaire. Overseas now claims that since it had no idea that it was subject to the review that its duties should be assessed at the 11.6% deposit rate that it paid upon importation. *Overseas Brief* at 7.

Defendant claims, however, that notification of the review and servicing of questionnaires was sent to MACHIMPEX headquarters in Beijing and that MACHIMPEX and all its branches had been subject to antidumping procedures since 1985 and they should have been familiar with Commerce's procedures. *Defendant's Memorandum* at 34. Furthermore, Commerce claims that no one notified Commerce that Liaoning was separate.

■ In determining whether substantial evidence supports Commerce's determination that plaintiffs were not independent from the national headquarters, the exporter must affirmatively demonstrate "an absence of central government control, both in law and in fact, with respect to exports." *Final Determinations of Sales at Less Than Fair Value: Sparklers From the People's Republic of China ("Sparklers From PRC")*, 56 Fed.Reg. 20,588, 20,589 (1991).

■ Evidence supporting *de jure* absence of central control includes: (1) absence of restrictive stipulations on individual exporter's business and export licenses; (2)

legislative enactments decentralizing control of companies; or (3) formal measures by the government decentralizing control of the companies. *Tianjin Machinery Import & Export Corp. v. United States*, 16 CIT —, —, 806 F.Supp. 1008, 1014 (1992). *De facto* absence of central government control should meet two prerequisites: (1) each exporter sets its own export prices independently of the government and other exporters; and (2) each exporter keeps the proceeds from its sales. *Id.*

In the present case, Overseas and Liaoning relied on two documents to support its claim that the Liaoning branch of MACHIMPEX is an independent entity. The first is a letter from Overseas which states that "each branch of China National Machinery is an independent company. Each branch has its own customers and independently sets its prices." *Defendants–Intervenors' (Deeter Foundry, et al.) Response in Opposition to Overseas Trade Corporation's Motion for Judgment Upon the Agency Record ("Defendant–Intervenors' Response")* at 14. The second piece of evidence submitted by Overseas is an October 11, 1990 letter from the Chinese Ministry of Foreign Economic Relations and Trade to Secretary Mosbacher which is not a part of the administrative record. *See id.* at 15.

Regardless of the propriety of reliance on this letter, the October 11 letter provides no specific information but instead states that all Chinese local trading companies were separated from the national trading companies. *Id.* In view of the extent of information submitted, it does not appear that MACHIMPEX Liaoning has met its burden of proof to establish their independence from MACHIMPEX. However, Liaoning was never afforded adequate opportunity to establish its independence.

In *Tianjin Machinery*, the court similarly ruled that plaintiffs were not independent legal entities on the grounds that they failed to prove their independence. *Tianjin Machinery*, 16 CIT at —, 806 F.Supp. at 1014–15. In *Tianjin Machinery*, however, plaintiffs were aware that they were subject to the review, and they were served with questionnaires that were completed. In the case at hand, Liaoning was not afforded with this opportunity.

*Best Information Available*

To add insult to injury, Commerce applied the "best information available" rule to Liaoning as an unresponsive company to calculate a dumping margin. *Overseas Brief* at 20–22. Overseas claims that Commerce's application was unsupported by substantial evidence since no review was requested of Liaoning and no questionnaire was served on that company. *Id.*

According to 19 U.S.C. § 1677e(c) (1988 & Supp.1993):

**Determinations to be made on best information available**

In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

Thus, the statute states that Commerce is authorized to use best information available when a party is unable or does not provide Commerce with the necessary information with which to make its determination. *Id.* In this case, Liaoning never refused and was never unable to supply the information. They did not respond since they were not given adequate opportunity because they simply did not know.

Furthermore, the MCFTC's request was not clear and understandable from the record. This court has held that there is "a burden on the party making the request to submit a clear, understandable and comprehensive request within the deadline set by the regulation." *Floral Trade Council v. United States*, 13 CIT 142, 144, 707 F.Supp. 1343, 1344–45, *aff'd*, 888 F.2d 1366 (Fed.Cir. 1989). It is clear to the Court in this case that the request was not clear, understandable and comprehensive. The request clearly did not list MACHIMPEX Liaoning. It merely listed MACHIMPEX and not any of its branches. It did, however, list several branches of Minmetals which gives rise to

the presumption that if Liaoning was to be included it would have been separately listed. Furthermore, the clarification letter sent by the MCFTC to Commerce on October 4, 1988 specifically requested clarification as to whether Minmetals branches were subject to the review but no such clarification was requested regarding MACHIMPEX which leads this Court to believe that the request did not include MACHIMPEX Liaoning. AR (Pub.) Doc. 29.

Granted, Commerce is not required to search out all subsidiaries of every company it reviews, but under the circumstances of this case, the Court cannot in all fairness deem MACHIMPEX Liaoning as within the scope of this review. Parties have an obligation to be precise in their requests thereby affording companies adequate notice to defend their interests. In this case, adequate notice was not given and, therefore, Overseas' motion for judgment on the agency record regarding this issue is granted and its duties are to be assessed at the 11.6% deposit rate that it paid upon importation.

5. *Company–Specific Rate v. Country–Wide Rate*

█ Plaintiff D & L Supply Co. ("D & L"), an importer of castings produced by Guangdong Metals and Minerals Import and Export Corporation ("Guangdong Minmetals"), claims that Commerce erred in refusing to give Guangdong Minmetals a separate company-specific antidumping margin.[2] *Plaintiff D & L Supply Co.'s Memorandum of Points and Authorities in Support of its Rule 56.1 Motion for Judgment on the Agency Record ("D & L Memorandum")* at 12. D & L further claims that Commerce's determination of a country-wide antidumping margin for every Chinese iron construction castings exporter was issued without a reasonable explanation and was contrary to existing precedent. *Id.* at 12–18. Plaintiff D & L claims that if Guangdong Minmetals qualified for a separate rate during the subsequent 1989–90 review period, then it also should have quali-

fied for separate rates during the two previous years. *Id.* 18–20.

On July 27, 1988, Commerce issued questionnaires to respondents including Guangdong Minmetals. In its questionnaire responses, Guangdong Minmetals provided information pertaining to its change in status from a branch of the China National Metals and Minerals Import and Export Corporation to an independent company. *Preliminary Results,* 55 Fed.Reg. at 22,940; AR (Pub.) Doc. 21 at 171. The separation from the main corporation allegedly took place in 1987, after the original antidumping investigation. AR (Pub.) Doc. 84. To substantiate its claim of independence, Guangdong Minmetals provided Commerce with business licenses, business cards, and letterhead. *Id.* Subsequently, Commerce issued its preliminary determination stating the following:

> In the course of the 1987–1988 review, both Minmet Beijing and Guangdong Minmetals claimed that they had changed in status from a branch of the China National Metals and Minerals Import and Export Corporation to a separate corporate entity since the original antidumping investigation. This claim was reiterated during the 1988–1989 review. Therefore, we sent questionnaires to each separately named branch and the headquarters of every import/export corporation of which we were aware. We analyzed the responses and calculated separate margins for each response that we received.

*Preliminary Results,* 55 Fed.Reg. at 22,940.

In fact, the Preliminary Results concluded by reiterating that Commerce was "calculating separate margins for each branch of each import/export corporation and its suppliers for the purposes of these reviews." *Id.*

Relying on Commerce's statements in the Preliminary Results, petitioners did not question Guangdong Minmetals' qualification for a separate rate in their briefs or during the hearing held on August 16, 1990. In fact, for the most part, petitioners concurred with

---

**2.** Plaintiff Overseas Trade Corporation ("Overseas") also raises this issue with regard to MACHIMPEX Liaoning. However, as to Overseas, this issue is now moot since the Court has ruled

in the preceding section of this opinion that this case is remanded to Commerce to assess duties against MACHIMPEX Liaoning at the 11.6% deposit rate that it paid upon importation.

Commerce on the Preliminary Results by stating in its prehearing brief:

> The general methodology used by the Department to calculate the foreign market value of constructed castings from the People's Republic of China was appropriate. As the foregoing discussion makes clear, however, certain technical corrections should be made to the Department's calculations for purposes of its final determination.

AR (Pub.) Doc. 160 at 15–16.

At the hearing, petitioners again expressed their general agreement with Commerce's approach. AR (Pub.) Doc. 164 at 35. When Commerce thereafter brought up the relationship between the responding companies, it addressed these points as "minor points." *Id.* at 75–77.

Thus, based on Commerce's Preliminary Results and its behavior at the hearing, petitioners relied on these actions and assumed that Commerce would continue its approach by setting separate margins for the Final Results.

In its Final Results, however, Commerce reversed its decision and subjected every Chinese exporter to a single country-wide rate. Commerce stated:

> In reevaluating our preliminary decision to apply separate margins to individual branches, we have examined the record to determine whether we have information which indicates that the national import/export corporations are independent from one another. We have found no such information. The respondents stated in their questionnaire responses that they were state-owned entities. Our determination that the PRC is a state-controlled economy in which all entities are presumed to export under the control of the state leads us to question the application of multiple rates, absent a clear showing of legal, financial and economic independence. Thus, we conclude that a single country-wide rate is appropriate for this case. We have determined one weighted-average margin for each review period for all ex-

ports from the PRC of iron construction castings.

*Final Results,* 56 Fed.Reg. at 2,744.

Plaintiff D & L now claims that Commerce failed to give D & L or Guangdong Minmetals any notice that the rates would abruptly go from company-specific to country-wide. *D & L Memorandum* at 10. Furthermore, D & L claims that Commerce failed to request any further information and that this drastic change was detrimental to D & L as Guangdong Minmetals' individual dumping margins were determined to be considerably lower than the weighted-average margin for all Chinese castings exporters. *Id.* In support of their arguments D & L notes that in the next administrative review covering the period from May 1, 1989 through April 30, 1990 ("1989–90 Review") Commerce reversed its position again and found that Guangdong Minmetals qualified for a separate antidumping margin. *See Final Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China ("Iron Construction Castings"),* 57 Fed.Reg. 10,644, 10,647 (1992); *see also D & L Memorandum* at 18–19.

Relying on *USX Corp. v. United States,* 11 CIT 82, 655 F.Supp. 487 (1987), D & L claims that Commerce has to give a reasonable explanation for imposing country-wide margins in the final determination when it stated that it would impose company-specific margins in its preliminary determination. *D & L Memorandum* at 13 (*citing USX,* 11 CIT at 84–85, 655 F.Supp. at 490); *SCM Corp. v. United States,* 2 CIT 1, 3, 519 F.Supp. 911, 913 (1981).

Defendant claims that Guangdong failed to show a clear record of legal, financial and economic independence, while plaintiff in essence claims that they were misled in relying upon Commerce's actions. Commerce explained its rationale for applying a single country-wide dumping margin to all branch companies by stating:

> In each of the examples cited above, the exporter is identified on the invoices as either the provincial or municipal (city) branch of a national import/export corporation.... Our determination that the PRC

is a state-controlled economy in which all entities are presumed to export under the control of the state leads us to question the application of multiple rates, absent a clear showing of legal, financial and economic independence.

*Final Results,* 56 Fed.Reg. at 2,744.

■ After Commerce notifies the national headquarters of the review, the national corporation should notify all of the branch companies and it is then the burden of the branch company to demonstrate that it is a separate entity. *Tianjin Machinery,* 16 CIT at ——, 806 F.Supp. at 1015. Plaintiffs must "meet their preliminary burden of creating an adequate record supporting a claim of independence." *Id.* at ——, 806 F.Supp. at 1015.

In determining whether substantial evidence supports Commerce's determination that plaintiffs were not independent from the national headquarters, the exporter must affirmatively demonstrate "an absence of central government control, both in law and in fact, with respect to exports." *Sparklers From PRC,* 56 Fed.Reg. at 20,589.

■ Commerce further claims that companies in non-market economy ("NME") countries are presumed to be part of a state-controlled operation. *Defendant's Memorandum* at 24. This presumption can be rebutted by the company proving its independence. Thus, in the context of a dumping determination, the burden of proof lies with the respondents and not Commerce. *Chinsung Indus. Co. v. United States,* 13 CIT 103, 106–07, 705 F.Supp. 598, 601 (1989). Exporters in a NME country are entitled to separate, company-specific margins by affirmatively meeting the *Sparklers From PRC* criteria which were discussed in detail in the

preceding section of this opinion.[3] *See Tianjin Machinery,* 16 CIT at ——, 806 F.Supp. at 1013–14 (quoting *Sparklers From PRC,* 56 Fed.Reg. at 20,589).

■ Once an exporter has submitted information to establish its independence from the state, it then becomes Commerce's duty to verify the information submitted by the respondent. *Tianjin Machinery,* 16 CIT at ——, 806 F.Supp. at 1015. This does not mean, however, that Commerce is required to seek out new information where the respondents have failed to meet their burden of creating "an adequate record supporting a claim of independence." *Id.* at ——, 806 F.Supp. at 1015.

In *Sparklers From PRC,* upon verification of documents respondents had submitted in that case, Commerce assigned separate, company-specific margins. During verification, Commerce found that each exporter set its own prices for exports and deposited its sales proceeds into a separate bank account. Furthermore, respondents had submitted their business licenses along with published explanations on the ramifications of receiving a business license. Commerce found that these explanations did not mention any stipulations that could be construed as specific central control of pricing or production. *Id.* at ——, 806 F.Supp. at 1014–15. Also, these explanations were published before the investigation had even begun.

The respondents in the *Tianjin Machinery* investigation had not submitted objective evidence to show absence of central control. *Id.* at ——, 806 F.Supp. at 1014. The court showed its emphasis by noting that in the case before it, the only pre-Petition document located by the court was an order stating what the company's new name would

---

**3.** In determining whether substantial evidence supports Commerce's determination that plaintiffs were not independent from the national headquarters, the exporter must affirmatively demonstrate "an absence of central government control, both in law and in fact, with respect to exports." *Final Determinations of Sales at Less Than Fair Value: Sparklers From the People's Republic of China ("Sparklers From PRC"),* 56 Fed.Reg. 20,588, 20,589 (1991).

Evidence supporting *de jure* absence of central control includes: (1) absence of restrictive stipu-

lations on individual exporter's business and export licenses; (2) legislative enactments decentralizing control of companies; or (3) formal measures by the government decentralizing control of the companies. *Tianjin Machinery Import & Export Corp. v. United States,* 16 CIT ——, 806 F.Supp. 1008, 1014 (1992). *De facto* absence of central government control should meet two prerequisites: (1) each exporter sets its own export prices independently of the government and other exporters; and (2) each exporter keeps the proceeds from its sales. *Id.*

be after independence and that it should start immediate proceedings for legal registration of its new name. *Id.* at ——, 806 F.Supp. at 1014–15 n. 4. In evaluating the order, the court stated that the order did not establish the company's formal registration of its new title or use of that title exclusive of any other name. *Id.* at ——, 806 F.Supp. at 1015. Thus, the order by itself did not establish that the company had in fact become independent.

In the *Final Results* in this case, Commerce stated, "[b]ased on our analysis of the comments received, the final results are changed from those presented in the preliminary results." *Final Results,* 56 Fed.Reg. at 2,744.

Commerce's primary reason for changing from company-specific to country-wide margins was Guangdong Minmetals' failure to meet its burden of showing "legal, financial and economic independence."

In Guangdong Minmetals' case, it submitted business licenses issued in 1988 and 1989, letterhead and business cards identifying it as Guangdong Metals and Minerals Import and Export Corporation. Commerce stated that this license showed Guangdong Minmetals to be a state-owned corporation. *Final Results,* 56 Fed.Reg. at 2,743. Commerce also relied on U.S. Customs Service records of entries identifying Guangdong Minmetals as the Guangdong (Province) Branch of the China National Metals and Minerals Import and Export Corporation. Thus, Commerce identified Guangdong Minmetals as a branch of a national import/export corporation. *Id.* at 2,744.

In rebuttal, plaintiff points to the fact that in subsequent cases Commerce found Guangdong Minmetals to be a separate entity and assigned it a company-specific rate.

In the *Iron Construction Castings* determination, 57 Fed.Reg. at 10,644, Commerce granted respondents separate, company-specific margins in its preliminary determination. *Preliminary Results of Antidumping Duty Administrative Review: Certain Iron Construction Castings From the People's Republic of China,* 57 Fed.Reg. 37,074, 37,074–075 (1991). Commerce did not change its

determination regarding this issue in its final results. *Iron Construction Castings,* 57 Fed. Reg. at 10,644. Commerce differentiates that determination from the one at hand by the amount of evidence submitted. In that case, bank records and other material proof were supplied. In this case, however, the material proof was never requested. If you do not ask for it, you cannot expect to get it.

■■■■ The burden of proof to show that a company is independent is on the respondent, but if it has not supplied enough information, the burden shifts to Commerce to ask for more information. Furthermore, it goes against all fairness for Commerce to say one thing in the preliminary results and then to have plaintiffs rely on this fact and not argue its case any further. Then, when plaintiffs cannot argue any further, Commerce changes its position and issues a final determination saying the complete opposite.

If Commerce felt that it should issue country-wide rates after it published the preliminary results, then Commerce should have issued an amended preliminary determination or provided respondents with supplemental questionnaires requesting additional proof regarding their independence. Instead, Commerce simply changed its position without giving notice to the respondents. Commerce cannot expect a respondent to be a mind-reader. Therefore, this case is remanded so that Commerce may seek further information from Guangdong Minmetals regarding its independence during the period involved and if it is satisfied that Guangdong Minmetals is an independent company, then Commerce shall set a company-specific rate for Guangdong Minmetals. If Commerce is not satisfied, then Commerce may continue to apply a country-wide rate for Guangdong Minmetals.

6. *Guangdong Minmetals' Notice or Opportunity to Comment*

Plaintiff D & L also claims that Commerce's failure to afford Guangdong Minmetals notice or opportunity for comment on Commerce's change from a company-specific rate to a country-wide rate between the preliminary and the final results is a violation of due process. *D & L Memorandum* at 20. D

& L states that since the Preliminary Results failed to mention that Commerce was contemplating a country-wide rate for all Chinese exporters of iron construction castings then D & L could not address this point in its brief. *Id.* at 20–21.

Commerce claims that it is not required, in order to reexamine a provisional conclusion contained in a preliminary result of an administrative review, to repeat notice and comment procedures already satisfied in the earlier phases of review. *Defendant's Memorandum* at 39.

It is well established that when considering a procedural due process issue, "the court must first determine whether a protected property or liberty interest exists, and if such an interest exists, then determine what procedures are necessary to protect that interest." *Techsnabexport, Ltd. v. United States,* 16 CIT ——, ——, 795 F.Supp. 428, 435 (1992); *American Ass'n of Exporters and Importers v. United States,* 751 F.2d 1239, 1250 (Fed.Cir.1985); *Comm. to Preserve Am. Color Television and Imports Comm., Tube Div., Elec. Indus. Ass'n v. United States,* 2 CIT 208, 218, 527 F.Supp. 341, 350 (1981).

Furthermore, "for an interest to be protected by the Constitution, it must be 'some interest worthy of protecting.'" *Techsnabexport,* 16 CIT at ——, 795 F.Supp. at 435 (*quoting American Ass'n of Exporters and Importers,* 751 F.2d at 1250). In order to be protected, an interest must be "more than a 'unilateral expectation.'" *PPG Indus., Inc. v. United States,* 13 CIT 183, 189, 708 F.Supp. 1327, 1331 (1989) (*quoting Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Moreover, it is "well settled that procedural due process guarantees do not require full-blown, trial type proceedings in all administrative determinations." *PPG Indus.,* 13 CIT at 189, 708 Supp. at 1332; *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). Ultimately, however, "in calculating the constitutional sufficiency of notice, the court must examine all of the circumstances and make a determination based upon the reasonableness of the notice

and participation." *Techsnabexport,* 16 CIT at ——, 795 F.Supp. at 436.

In *Lois Jeans & Jackets, U.S.A., Inc. v. United States,* 5 CIT 238, 566 F.Supp. 1523 (1983), the court also added that prejudice to the party should be strongly considered in determining whether due process rights are violated. In *Lois Jeans & Jackets,* the court stated that "the procedural irregularities complained of by Lois—viz., lack of notice and opportunity to comment—are so fundamentally prejudicial as to constitute a deprivation of due process." *Id.* at 243, 566 F.Supp. at 1528.

In the case at hand, under the circumstances, this Court agrees that plaintiffs were likewise denied notice and opportunity to comment which constituted fundamental prejudice to them. Therefore, as previously mentioned, this case is remanded to Commerce so that Commerce may seek further information from Guangdong Minmetals regarding its independence, and if it is satisfied that Guangdong Minmetals is an independent company, then Commerce shall set a company-specific rate for Guangdong Minmetals.

### 7. *Guangdong Minmetals' Warehousing Costs*

 Plaintiff D & L also claims that Commerce's adjustment to Guangdong Minmetals' constructed value for "after-sale" warehousing costs was inappropriate. *D & L Memorandum* at 27.

In its Final Results, Commerce held as follows:

> [A]n adjustment should be made to account for after-sale warehousing expenses. Guangdong Minmetals reported that it stored finished merchandise in a warehouse for an average of one week after the time of sale and before the time of shipment. Therefore, . . . we made an adjustment to constructed value, using, as the best information otherwise available, petitioners' estimate of the average U.S. costs for storing finished castings in rented warehouses during 1988.

*Final Results,* 56 Fed.Reg. at 2,745.

D & L claims that this adjustment was inappropriate for several reasons. First, D

& L claims that "after-sale" warehousing costs generally refer to warehousing that is relatively lengthy and is a condition of the sale. *D & L Memorandum* at 28.

D & L also claims that Commerce erred in using U.S. costs for storing finished castings as best information available. It claims that by using these costs Commerce penalized Guangdong Minmetals since it cooperated fully with its information requests. *D & L Memorandum* at 29.

In its questionnaire for the 1988–89 review period, Commerce requested Guangdong Minmetals to specifically identify the sales on which it incurred after-sale warehousing expenses, the amount of expense attributable to each sale, any allocations used and the source of the data. AR (Pub.) Doc. 62 at B–11. Guangdong Minmetals responded by simply stating that the "subject merchandise [was] stored in Minmetals Guangdong's own warehouse for a short period before shipment. The average time of storage was about one week." AR (Pub.) Doc. 89 at 6.

Commerce subsequently filed a deficiency letter with Guangdong Minmetals requesting clarification of the date, terms of sale, the manner in which the customer orders were received and whether sales were off the shelf or made to order. AR (Pub.) Doc. 98. Commerce also requested that Guangdong Minmetals report any after-sale warehouse expenses that were incurred. *Id.* at 3. Guangdong Minmetals provided little information and no documentation in response to this request compelling Commerce to use United States data.

In *Novachem, Inc. v. United States,* 16 CIT ——, 797 F.Supp. 1033 (1992), the court similarly affirmed Commerce's use of United States industry data when a respondent failed to cooperate, stating that 19 U.S.C. § 1677b(c) "does not prohibit and Commerce's regulations provide that the United States may be used for surrogate pricing." *Id.* at ——, 797 F.Supp. at 1038. Thus, this Court agrees that in this case Commerce also acted reasonably in making an adjustment to Guangdong Minmetals' constructed value for "after-sale" warehousing costs and, therefore, plaintiff D & L's motion is denied and this issue is hereby affirmed.

## 8. *Depreciation Estimate*

■ Plaintiff D & L also contests Commerce's use of petitioner's depreciation estimate as best information available. *D & L Memorandum* at 30. Commerce requested information relating to the Chinese respondents' machinery for both periods of review to value depreciation expenses. Specifically, Commerce requested interested parties to provide a "surrogate value for each piece of machinery used to produce iron construction castings or a methodology for determining depreciation expense for each period of review." *Final Results,* 56 Fed.Reg. at 2,747. In its Final Results, Commerce stated that "[r]espondents did not provide sufficient information prior to the preliminary results of review to demonstrate that the Chinese producers of iron construction castings had no depreciable assets during the review period." *Id.*

Upon reviewing the information submitted in this case, the Court deems respondents' submissions as adequate. On August 28, 1989, Beijing Metals & Minerals Import & Export Corporation ("Minmet Beijing") submitted information listing all assets and their date of purchase and further stated the current government regulation for depreciation of assets in the foundry. AR (Pub.) Doc. 88, Exhibit 8. On March 14, 1990, Minmet Beijing and Guangdong Minmetals supplied information concerning depreciation rates from India. AR (Pub.) Doc. 118. Respondents further supplied Commerce with the dates of acquisition or construction of the major items of equipment used to manufacture iron castings. AR (Pub.) Doc. 21 at 11.

Moreover, as D & L notes in its brief, the United States depreciation figures that Commerce used are inapposite as there is no indication that the type of equipment used in the United States and in China are similar. *D & L Memorandum* at 31.

According to 19 U.S.C. § 1677e(c), Commerce is authorized to use best information available when a party is unable or does not provide Commerce with the necessary information with which to make its determination. Use of the best information available rule is

not to be resorted to when respondents have supplied adequate information. In this case, the Court deems respondents' submissions as sufficient and, therefore, this case is remanded to Commerce to recalculate the depreciation expenses using the information supplied by respondents.

### 9. *Raw Materials*

Plaintiffs Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Division, Virginia Industries Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry Inc., Tyler Pipe Industries Inc., U.S. Foundry & Manufacturing Co. and Vulcan Foundry, Inc. ("Deeter") claim that Commerce improperly valued some of the raw material factors using Philippine import statistics while valuing other raw material factors using U.S. costs. *Deeter's Memorandum of Points and Authorities in Support of Motion for Judgment Upon the Agency Record ("Deeter Memorandum")* at 12. Deeter clarifies that it has no objection to Commerce's exclusive use of Philippine import statistics or United States costs to value the factors of production. It does, however, object to the use of the two different valuation methods. *Id.* at 12–13.

Deeter claims that in its preliminary determination Commerce relied on Philippine import statistics to value the raw material factors of production. *Id.;* AR (Pub.) Doc. 121. In their case briefs, the respondents and importers objected to certain import categories chosen by Commerce, claiming that the values reported for the specific import categories were higher than the United States costs reported by petitioners. AR (Pub.) Doc. 158. Commerce reevaluated its decision to use Philippine import statistics in the final determination. Commerce's Final Results memorandum states that the import category for sand includes two types of sand, foundry and blasting sand. Commerce subsequently rejected the Philippine import statistics for sand because they found that foundry sand was generally less expensive than blasting sand. On the same note with respect to other raw materials, Commerce noted that

> in light of similar discrepancies with respect to bentonite, talc powder, thinner and banana oil, we have reevaluated our preliminary decision to separately value each indirect material used in the production of iron construction castings with the weighted-average import price into the Philippines.

*Final Results,* 56 Fed.Reg. at 2,746.

Deeter accepts that there were discrepancies between foundry sand and blasting sand because these discrepancies were documented on the record. AR (Pub.) Doc. 179. For example, Commerce's analyst contacted a sand expert who noted the discrepancies. *Id.* Deeter claims that there is no such documentation to support "similar discrepancies" with respect to the other mentioned raw materials.

Defendant-intervenor D & L, however, disagrees with Deeter and claims that Commerce acted reasonably. *Defendant–Intervenor D & L Supply Co.'s Memorandum of Points and Authorities in Opposition to Plaintiffs Deeter Foundry, Inc., et al. Rule 56.1 Motion For Judgment on the Agency Record ("Defendant–Intervenor D & L Memorandum")* at 6–12.

Nevertheless, after reviewing Deeter's arguments, Commerce has now concluded that Deeter is correct with respect to this issue and asks the Court to remand this issue to Commerce so that Commerce may clarify why it valued the other indirect materials in the same manner as it did sand, using United States industry data. *Defendant's Memorandum* at 59.

Commerce also states that, if necessary, it should be permitted to gather more information regarding the appropriate basis for valuing these input materials. *Id.* Therefore, this case is remanded to Commerce to clarify why it valued indirect materials using United States industry data and to gather more information if necessary.

Deeter also claims that the use of Philippine import statistics to value pig iron, scrap iron and coke, which Commerce considered

direct input materials, contained the same discrepancies as the indirect materials and, therefore, should not have been used to value the factors of production. *Deeter Memorandum* at 17. Deeter feels that Commerce acted inconsistently. *Id.* Commerce, however, does not necessarily agree with Deeter that all of the input categories for direct materials contained discrepancies, but concedes that to the extent the record is unclear it asks this Court to remand the case so that Commerce can review and or revise its decision if necessary. *Defendant's Memorandum* at 59–60. The Court agrees and, therefore, this issue is also remanded to Commerce to review and/or revise its decision regarding direct materials.

### 10. *Manufacturing Costs*

Plaintiff Deeter also claims that Commerce erred in failing to include all costs incurred by the Chinese producers to manufacture castings. *Deeter Memorandum* at 19. Although Commerce originally decided that verification was necessary in the first review, it cancelled verification because of civil unrest in the People's Republic of China. *Id.* Deeter now claims that when faced with omissions or contradictions in data, Commerce either presumed that no costs were incurred or used the lowest factor or value available to calculate the dumping margins. *Id.* Specifically, plaintiff Deeter claims that Commerce failed to (a) calculate the cost of special features and bolts sold with the castings, (b) account for skilled laborers that were used to manufacture castings, and (c) account for all overhead costs incurred by the Chinese respondents. *Id.*

(a) *Special Features and Bolts.* Deeter first claims that Commerce failed to account for the cost of bolts, attachments and other special features sold with iron construction castings. *Id.* at 20. Upon review of its response to this allegation in the final results, Commerce concedes that a discrepancy may exist with respect to this issue and that a remand is in order to review the record. *Defendant's Memorandum* at 76–77. For this reason, this issue is remanded to Commerce to review the record and determine whether all such materials have been accounted for.

■ (b) *Skilled Laborers.* Deeter also claims that Commerce failed to account for certain labor costs. Commerce, however, claims that Deeter failed to exhaust its administrative remedies because it did not raise this particular challenge in its case or rebuttal briefs before Commerce. *Defendant's Memorandum* at 72.

According to 19 C.F.R. § 353.38(a) (1991): "The Secretary will consider in making the final determination ... only written arguments in case or rebuttal briefs filed within the time limits in this section."

Deeter claims that the domestic industry did raise this issue numerous times during the administrative proceedings, albeit not in its case or rebuttal briefs, but during the administrative proceeding nevertheless. *See* AR (Pub.) Docs. 36 at 8, 52 at 8, 53 at 8, 57 at 13, 58 at 15–16, 68 at 10, 69 at 10, 94 at 14–15, 95 at 9–10, 109 at 5–6, 110 at 14, 113 at 20–22, 114 at 6, 116 at 6–7.

■ Although a party cannot bring up an issue on appeal when it has not exhausted its administrative remedies, there is an exception to this rule if to bring up the issue would be futile. *See Rhone Poulenc,* 7 CIT at 136, 583 F.Supp. at 611. This instance falls within the futility exception to the rule because plaintiffs repeatedly raised this issue during the administrative proceedings and, therefore, the Court will now address plaintiffs' argument.

Upon reviewing the record in this case, the evidence is conflicting. Deeter claims that Commerce failed to account for certain labor costs, namely skilled labor. *Deeter Memorandum* at 23–24. Because Commerce was unable to verify the information submitted by the respondents, it based its determination on direct and indirect labor solely on the information submitted which stated that there was no skilled labor. *Defendant's Memorandum* at 73. However, the drawings submitted by the respondents indicated the involvement of skilled machinists. Respondents also used lathes, which require skilled labor for operation. *Deeter Memorandum* at 23–24. Deeter now claims that

Commerce's determination of labor costs are not supported by substantial evidence on the record and that this issue should thus be remanded for further investigation. *Deeter Memorandum* at 25; *Reply of Deeter Foundry, Inc. et al. to Defendant's and D & L Supply Co.'s Opposition to Motion for Judgment Upon the Agency Record* at 10.

Upon review of the evidence in this case the Court agrees and, therefore, Deeter's motion on this issue is granted and this case is remanded for further investigation on whether labor costs were skilled or unskilled.

■■■ (c) *Overhead Costs.* Plaintiff Deeter also claims that Commerce failed to account for all overhead costs incurred by respondents. *Deeter Memorandum* at 25. At oral argument, counsel for Deeter stated that typically factory overhead includes indirect materials and indirect labor costs. Deeter further admits that respondents provided limited data pertaining to overhead costs in their questionnaire responses. *Id.;* AR (Pub.) Docs. 88–89. Commerce subsequently sent deficiency letters to respondents seeking more detailed information on overhead costs. AR (Pub.) Doc. 97 at 5; (Pub.) Doc. 98. Respondents noted that they incurred maintenance costs as part of their overhead costs, yet no explanation of these costs was provided. AR (Pub.) Doc. 22 at 10. Deeter claims that although respondents failed to adequately include factors for these costs, these costs should not be excluded from the calculations altogether. Furthermore, Deeter now claims that petitioners did include in their submissions complete costs related to overhead costs, including expenses for depreciation, utilities, indirect materials, parts, indirect labor, maintenance workers, depreciation and interest expense. They further claim, however, that Commerce did not rely on all the information submitted. *Deeter Memorandum* at 26. Deeter claims. that Commerce failed to include these costs in its factor-of-production analysis because the respondents failed to report them in their questionnaire and deficiency responses. *Id.*

Commerce, on the other hand, claims that it reasonably exercised its discretion in calculating the overhead costs incurred by the Chinese producers. *Defendant's Memoran-*

*dum* at 74–75. Commerce further contends that the overhead costs were captured in other portions of the constructed value calculations.

The administrative record, however, is unclear of this fact and Commerce has also not clarified this in its briefs. AR (Conf.) Doc. 23. Commerce stated that it reasonably considered such fixed costs to have been included in direct factory overhead (including depreciation) and other areas. AR (Pub.) Doc. 121 at 7, 10–11. It is not obvious to the Court that this is the case.

It is well settled that "[c]entral to a proper determination by Commerce is some discussion on the record" as to its determinations. *See Toho Titanium Co. v. United States,* 11 CIT 160, 167, 657 F.Supp. 1280, 1286 (1987); *see also NSK Ltd. v. United States,* 16 CIT ——, ——, 809 F.Supp. 115, 118–19 (1992); *Koyo Seiko Co. v. United States,* 17 CIT ——, ——, 810 F.Supp. 1287, 1293 (1993). In *NSK Ltd.,* this Court remanded the case to Commerce to either reconsider its determination or to substantiate on the record its rationalization. *NSK Ltd.,* 16 CIT at ——, 809 F.Supp. at 119. In light of the circumstances in the case at hand, the Court deems the same remedy appropriate in this case and, therefore, this case is remanded to Commerce to reconsider the information submitted by petitioners regarding overhead costs, or to substantiate on the record why it should not, or to point out in the record where these overhead costs were included.

## 11. *Inland Freight Costs*

■■■ Plaintiff Deeter also claims that Commerce erred in failing to make proper adjustments for inland freight costs incurred to transport raw materials to the foundries. *Deeter Memorandum* at 29. To value pig iron, scrap iron and coke, Commerce relied on Philippine import statistics. *Id.* These statistics included the freight required to transport materials from the point of production in the foreign country to the point of export, and the ocean freight necessary to transport the goods from the country of origin to the Philippines. *Id.; Final Results,*

56 Fed.Reg. at 2,746. Commerce noted that the import prices included

> the inland freight required to transport materials from the point of production to the point of export, and, the ocean freight required to transport the goods from the country of origin to the Philippines. Since foreign inland freight is already included in the weighted-average import prices used to value each material, we have not increased material prices to account for the freight expense of transporting materials from the point of purchase to the foundry for the final results of review.

*Id.*

Deeter claims that Commerce disregarded the actual freight factors reported by the Chinese respondents and, thus, improperly understated the inland freight costs incurred to transport the raw materials from the suppliers to the Chinese foundries. *Deeter Memorandum* at 31. The import data, however, which Commerce relied upon to value the material input inland freight costs represented a weighted-average of the freight costs from a number of market economy countries. *Final Results,* 56 Fed.Reg. at 2,746. In fact, as Deeter claims, the import statistics might have understated the Chinese costs. By the same token, they might have overstated them as well.

Nevertheless, Commerce still ignored actual data submitted by respondents. The data they submitted might have been more difficult to use and it is easy to forsake actual data for best information available, but this investigative tool is often used too freely.

The primary purpose of the best information available statute is to provide Commerce with a means of conducting its investigation when a party "refuses or is unable to produce information requested in a timely manner and in the form required" or when a party "otherwise significantly impedes an investigation." *See* 19 U.S.C. § 1677e(b). This was not the case here. Actual data was on the record in this case and Commerce should have used it. Therefore, this case is remanded to Commerce to recalculate freight costs using the information on the record which was submitted by respondents.

**12. *Reimbursement to U.S. Importers***

Plaintiff Deeter also claims that Commerce failed to investigate whether Chinese castings producers reimbursed U.S. importers of Chinese castings for U.S. antidumping duty payments. *Deeter Memorandum* at 31. During the administrative review, petitioners alleged that Minmet Beijing and Guangdong Minmetals "may be reimbursing their importers for antidumping duties." AR (Pub.) Doc. 35 at 9; (Pub.) Doc. 116 at 8.

Prior to the Preliminary Results, respondents stated that no reimbursements occurred. *See Defendant's Memorandum* at 77; *see also* AR (Conf.) Doc. 34. In its Final Results, Commerce addressed this issue and stated:

> Petitioners have provided no evidence on the record that respondents are reimbursing importers for antidumping duties on sales subject to these reviews. Furthermore, 19 CFR 353.26 requires that importers certify to the U.S. Customs Service that they have not entered into an agreement with the manufacturer or exporter for the payment or refunding of antidumping duties. Therefore, any reimbursement is an appropriate matter for the U.S. Customs Service.

*Final Results,* 56 Fed.Reg. at 2,745.

According to 19 C.F.R. § 353.26(a)(1), in calculating United States price, Commerce "will deduct the amount of any antidumping duty which the producer or reseller: (i) Paid directly on behalf of the importer; or (ii) Reimbursed to the importer." Paragraph (b) requires the importer prior to liquidation to file a certification with the U.S. Customs Service stating that it has not paid or been reimbursed for dumping duties. 19 C.F.R. § 353.26(b). Commerce may presume from an importer's failure to file the certificate required in paragraph (b) that the producer or reseller paid or reimbursed the antidumping duties. 19 C.F.R. § 353.26(c). The regulations do not impose upon Commerce an obligation to investigate based on mere allegations.

In this case, petitioners have not set forth any evidence to support the claim that the

**1274**

reimbursement was taking place or that the importers had failed in the past to file the requisite certifications. Therefore, Commerce's determination on this issue is reasonable and is hereby affirmed.

### 13. *Clerical Errors*

Plaintiff Deeter lastly claims that Commerce committed several clerical errors in calculating its dumping margins. Specifically, Deeter claims that Commerce (1) improperly calculated the amount of aluminum consumed in production, and (2) improperly calculated the amount of fireclay consumed in production.

Commerce concedes that two errors exist. Commerce concedes it improperly calculated the amount of aluminum consumed in production and the amount of fireclay consumed in production and, therefore, agrees with Deeter that these matters should be remanded to Commerce. *Defendant's Memorandum* at 79–80. Therefore, this case is remanded to Commerce for correction of these clerical errors.

Deeter alleges a third clerical error, that being that Commerce failed to calculate properly the raw material factors that were valued using petitioners' additives and supplies data. Deeter claims that in relying upon petitioners' additives and supplies data to value certain factors of production, Commerce improperly failed to include freight-in costs for procuring these items. *Deeter Memorandum* at 33.

Defendant-intervenor D & L Supply Co. claims that Commerce did not commit a clerical error regarding raw material factors. *Defendant–Intervenor D & L Memorandum* at 20. D & L further states that if Commerce included freight in the cost of additives, then it would risk double counting of freight since the freight is possibly already accounted for in the costs reported by petitioners for the additives themselves. *Id.*

Commerce acknowledges that it has already requested that the Final Results be remanded to allow Commerce to review and, if necessary, to revise its decision regarding the appropriate basis for valuing the factors of production. *Defendant's Memorandum* at

79–80. Since this clerical error alleged by Deeter pertains to this issue, Commerce requests that it be permitted on remand to review Deeter's allegation involving freight costs. *Id.* The Court agrees and this case is remanded for this purpose.

### *Conclusion*

In accordance with the foregoing opinion, plaintiffs' motion for judgment on the agency record is granted in part and this case is remanded to Commerce to (1) assess duties against MACHIMPEX Liaoning at the 11.6% deposit rate that it paid upon importation; (2) seek further information from Guangdong regarding its independence and if it is satisfied that Guangdong is an independent company, Commerce shall set a company-specific rate for Guangdong; if not, then Commerce may continue to apply a country-wide rate for Guangdong; (3) recalculate the depreciation expenses using the information supplied by respondents; (4) clarify why it valued other indirect materials in the same manner as it did sand by using U.S. industry data and gather more information if necessary; (5) review or revise its decision regarding direct materials; (6) determine whether all the costs regarding bolts, attachments and other special features were accounted for; (7) further investigate whether labor costs were skilled or unskilled; (8) reconsider the information submitted by petitioners regarding overhead costs, or to substantiate on the record why it should not; (9) recalculate freight costs; (10) correct clerical errors involving the amounts of aluminum and fireclay consumed in production; and (11) review Deeter Foundry, Inc.'s allegations regarding the raw material factors.

Plaintiffs' motion is denied in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Comments to remand results are due thirty (30) days thereafter. Responses to comments are due within fifteen (15) days of the date comments are due.