SIGMA CORPORATION, U.V. International, Southern Star, Inc., City Pipe and Foundry, Inc. and Long Beach Iron Works; Overseas Trade Corporation; D & L Supply Co.; Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry, Co., Bingham & Taylor Division, Virginia Industries Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., Lebaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry Inc., Tyler Pipe Industries Inc., U.S. Foundry & Manufacturing Co. and Vulcan Foundry, Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

D & L Supply Co., Defendant–Intervenor,

Deeter Foundry, Inc. et al., Defendant–Intervenors.

Court No. 91–02–00154.
Slip Op. No. 95–102.

United States Court of International Trade.

June 1, 1995.

White & Case, Washington, DC (Walter J. Spak and Vincent Bowen), for plaintiffs Sigma Corp., U.V. Intern., Southern Star, Inc., City Pipe and Foundry, Inc. and Long Beach Iron Works.

Ross & Hardies, Washington, DC (Jeffrey S. Neeley), for plaintiff Overseas Trade Corp.

Cameron & Hornbostel, Washington, DC (Dennis James, Jr.), for plaintiff and defendant-intervenor D & L Supply Co.

Collier, Shannon, Rill & Scott, Washington, DC (Paul C. Rosenthal, Mary T. Staley and Robin H. Gilbert), for plaintiffs and defendant-intervenors Deeter Foundry, Inc., Alhambra Foundry, Inc., Allegheny Foundry Co., Bingham & Taylor Div., Virginia Industries, Inc., Campbell Foundry Co., Charlotte Pipe & Foundry Co., East Jordan Iron Works, Inc., LeBaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Pinkerton Foundry, Inc., Tyler Pipe Industries, Inc., Vulcan Foundry, Inc. and U.S. Foundry & Mfg. Co.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Velta A. Melnbrencis and Paul Herrup); of counsel: Jeffery C. Lowe and Robert J. Heilferty, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

## OPINION

TSOUCALAS, Judge:

Plaintiff D & L Supply Company ("D & L" or "plaintiff") and defendant-intervenors U.S. Foundry & Manufacturing Co., Alhambra Foundry, Inc., Allegheny Foundry Co., Bingham & Taylor Division, Virginia Industries, Inc., Charlotte Pipe & Foundry Co., Deeter Foundry Inc., East Jordan Iron Works, Inc., LeBaron Foundry Inc., Municipal Castings, Inc., Neenah Foundry Co., Opelika Foundry Co., Inc., Tyler Pipe Industries, Inc., Vulcan Foundry, Inc., Campbell Foundry Co. and Pinkerton Foundry Inc. ("defendant-intervenors" or "domestic industry") challenge as unsupported by substantial evidence and not in accordance with law the Department of Commerce, International Trade Administration's ("Commerce") redetermination on remand filed in this case, *Iron Construction Castings from the People's Republic of China: Final Results of Redetermination Pursuant to Court Remand, Slip Op. 93–230* ("*Remand Results*"). Specifically, D & L contests Commerce's refusal to give Guangdong Minmetals ("Guangdong") a separate antidumping rate, calculation of freight costs and calculation of labor costs for lathe operators. Defendant-intervenors contest Commerce's use of two different methodologies to value pig iron and raw material inputs, failure to add freight-in costs to additives and supplies cost, failure to include a separate amount for indirect material costs in its overhead calculations and failure to collect additional information to calculate Guangdong's depreciation expenses.

### Background

In *Sigma Corp. et al. v. United States*, 17 CIT ——, 841 F.Supp. 1255 (1993), the Court remanded this case for Commerce to, *inter alia*, seek further information from Guangdong regarding its independence and if it is satisfied that Guangdong is an independent company, set up a company-specific rate for Guangdong and, if not, to continue to apply a country-wide rate to Guangdong; to recalculate the depreciation expenses using the information supplied by respondents; to clarify why it valued other indirect materials in the same manner as it did sand by using U.S. industry data and gather more information if necessary; to review or revise its decision regarding direct materials; to further investigate whether labor costs were skilled or unskilled; to reconsider the information submitted by petitioners regarding overhead costs, or to substantiate on the record why it should not; and to review its failure to include freight-in costs for procuring additives and supplies.

Commerce filed the Remand Results on June 8, 1994. Oral argument was held on November 22, 1994.

### Discussion

Commerce's final results filed pursuant to a remand will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Alhambra Foundry Co.*

*v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

### 1. *Guangdong's Antidumping Rate*

This Court remanded this issue for Commerce to gather further information from Guangdong regarding its independence during the period of review and, if Commerce is satisfied that Guangdong is an independent company, to set a company-specific antidumping duty rate for Guangdong. If Commerce is not satisfied, then Commerce was to continue to apply the country-wide rate to Guangdong. *Sigma Corp.,* 17 CIT at ——, 841 F.Supp. at 1267.

Commerce had provided Guangdong with a questionnaire requesting evidence regarding its claim of independence from export sales and pricing. Guangdong responded on March 21, 1994. On remand, Commerce determined that Guangdong has not demonstrated a lack of government control and has, therefore, not met the requirements for receiving a separate rate. *Remand Results* at 3–8.

D & L, an importer of castings produced by Guangdong, argues this Court should instruct Commerce to revise the Remand Results to apply a separate rate to Guangdong. D & L asserts Guangdong has adequately rebutted the presumption of state control. D & L contends that, because Guangdong operates in a province of the People's Republic of China ("PRC") which has introduced market economics and is owned by that province, it is more likely to have been independent of central control than Minmet Beijing, a company from another province whose rates were combined with Guangdong's. Finally, because similar information was submitted in another review for which Commerce deemed Guangdong to be independent and granted Guangdong a separate rate, D & L asserts Guangdong should receive a separate rate for this review period as well. *Plaintiff D & L Supply Company's Comments on the Remand Results ("D & L's Brief")* at 1–7.

Commerce states it has acted properly, complying with this Court's order to provide Guangdong with an opportunity to place evidence on the record establishing the absence of *de jure* and *de facto* government control.

Commerce argues Guangdong has failed to so demonstrate the absence of government control. *Response of Defendant United States of America to Plaintiff D & L Supply Company's Comments on the Remand Results ("Defendant's Brief")* at 1–8.

■ In evaluating whether substantial evidence supports Commerce's determination that Guangdong was not independent from government control, the exporter must affirmatively demonstrate "an absence of central government control, *both in law and in fact,* with respect to exports." *Sigma Corp.,* 17 CIT at ——, 841 F.Supp. at 1262 (emphasis added, citation omitted).

■ Evidence supporting *de jure* absence of central government control includes: (1) absence of restrictive stipulations on individual exporter's business and export licenses; (2) legislative enactments decentralizing control of companies; or (3) formal measures by the government decentralizing control of the companies. *De facto* absence of central government control should meet two prerequisites: (1) that each exporter set its own export prices independently of the government and other exporters; and (2) that each exporter keep the proceeds from its sales. *Id.* at ——, 841 F.Supp. at 1262–63.

■ Upon examination of the record, this Court finds that Guangdong has not met its burden of demonstrating an absence of government control.

Guangdong presented several documents to establish that it was not subject to *de jure* control, but the only law in place during the 1987–88 review, the General Code of the Civil Law of the PRC adopted April 12, 1986, does not confer independence on the branches of state-owned enterprises. *Remand Results* at 5. Accordingly, Commerce properly applied a country-wide rate to Guangdong for the 1987–88 review.

As to the 1988–89 review, Commerce did find that Guangdong was *de jure* absent of government control during that period because the laws and regulations cited by Guangdong indicate it had the status of a legal person, was legally independent in its business operations and was fully responsible for

its management, property and accounting. *Remand Results* at 5–6. However, Guangdong failed to meet its burden of demonstrating *de facto* absence of central government control. Except for a certification from its parent corporation attesting that it acted independently during the period of review, Guangdong provided no evidence on the record establishing that it negotiated prices or sales with its customers or that it was actually responsible for its profits and losses. *Remand Results* at 7. Guangdong also provided copies of its business licenses (information which describes the scope of its business activities) but, like the certification from its parent corporation, the licenses do not demonstrate the lack of *de facto* government control for the 1988–89 review period. *Remand Results* at 8. Thus, Commerce properly applied a country-wide rate to Guangdong for the 1988–89 review.

Accordingly, this Court affirms Commerce's action on this issue.

## 2. *Freight Costs*

This Court remanded this case to Commerce with instructions that it recalculate freight costs using the information on the record which was submitted by respondents, rather than the best information available used by Commerce which consisted of the weighted average of the freight costs from a number of market economies. *Sigma Corp.,* 17 CIT at ——, 841 F.Supp. at 1273.

On remand, Commerce calculated freight costs by adding the freight charges between the mine and the raw material foundry within the PRC to the CIF (cost, insurance and freight) value of raw materials imported into the Philippines, the market economy country Commerce used to establish foreign market value. Commerce valued the freight within the PRC using respondents' quantity and distance data and petitioners' trucking rates. *Remand Results* at 19–20.

D & L maintains these freight costs are overstated and should be revised by deleting Chinese inland freight from the calculations or, at a minimum, should be recalculated based on the distance from the port to the foundry. D & L asserts Commerce has used a distance for freight cost that is not in the record because Commerce should have used the distance between the mine and the place pig iron is made and not the distance between the mine and the "raw material foundry." Plaintiff states Commerce should not be adding this amount in the first place, as this cost is already included in the cost of pig iron purchased by the foundry and Commerce should not be considering the freight costs for iron ore. In addition, D & L argues Commerce has double counted freight and has improperly mixed PRC-produced pig iron freight costs with surrogate Philippine pig iron freight costs. *D & L's Brief* at 7–13.

Commerce states it properly recalculated freight costs in accordance with the Court's remand instructions using the actual distances in China for transportation of pig iron and other inputs. Commerce acknowledges that it previously failed to properly account for the freight charge of transporting the raw materials used in the production of the castings. Commerce asserts one reasonable method of doing so is to base the calculation upon the actual distances within China, the nonmarket economy country. *Defendant's Brief* at 8–13. Domestic industry supports Commerce's position. *Domestic Industry's Rebuttal to D & L's Comments on the Commerce Department's Remand Results ("Domestic Industry's Rebuttal")* at 1–5.

■ This Court agrees with Commerce and domestic industry. As the import statistics price (from the Philippines) for pig iron contained an unknown amount of freight (for transporting the input from the exporting countries to the dock in the surrogate country), Commerce has reasonably relied upon the actual distances in the PRC that the inputs were transported for calculating the additional freight charge. Were respondents operating in a market economy, they would be required to pay a market rate for moving the inputs the entire distance from the various sources to the castings factory, and Commerce would include that amount in any cost calculation of freight. Because this is a nonmarket economy case and Commerce must rely upon surrogate data, Commerce calculated a reasonable amount of freight using a freight rate based upon petitioners' data and

the actual distances reported by the respondents in China.

This Court has recently upheld this methodology for calculating inland freight charges and sees no reason to deviate from that decision in the case at bar. *See Sigma Corp. et al. v. United States,* 19 CIT ——, ——, 888 F.Supp. 159, 162 (1995). Accordingly, the Court hereby affirms Commerce on this issue.

### 3. *Labor Costs for Lathe Operators*

On remand, Commerce recalculated Guangdong's labor costs in order to include the skilled labor cost of lathe operators. *Remand Results* at 15.

■ D & L states the calculation is incorrect. Plaintiff points out that Commerce multiplied the "machining time" per metric ton by 2204.6 to get "total manhours" for lathe operations. The figure 2204.6 is the number of pounds in a metric ton and has no other relevance to the calculation. Plaintiff states that what Commerce intended to do was multiply the machining time per metric ton by the production quantities of Guangdong's foundries. D & L indicates that the correct calculation would be to take the machining time per metric ton and multiply that by the production (in metric tons) of each foundry. The result derived for each foundry would then be applied to that foundry. *D & L's Brief* at 13–14. Commerce agrees with D & L and requests a remand for correction of this error. *Defendant's Brief* at 13–14.

Accordingly, this Court remands this issue for correction of the error committed in calculating skilled labor costs of lathe operators, namely, for Commerce to multiply the machining time per metric ton by the production in metric tons of each foundry.

### 4. *Raw Materials*

Commerce valued some of the raw material factors using Philippine import statistics while valuing other raw material factors using U.S. costs. The Court remanded this case for Commerce to clarify why it valued other indirect materials in the same manner as it did sand by using U.S. industry data and gather more information if necessary, and review or revise its decision regarding direct materials. *Sigma Corp.,* 17 CIT at ——, 841 F.Supp. at 1270–71.

On remand, Commerce determined it was not necessary to collect additional information on the individual components of indirect materials. Because of marked price discrepancies, Commerce concluded that valuation of the indirect materials with the import statistics data would lead to unreasonable results. Commerce relied upon the import statistics for valuing direct materials because the price discrepancies within the direct material import categories were less broad and did not dramatically affect average prices. *Remand Results* at 10–13.

Domestic industry argues Commerce should not use the Philippine import statistics to value the pig iron factor of production. Domestic industry takes issue with Commerce's decision to treat sand and pig iron differently, asserting the price discrepancies are the same for both and the import statistics for pig iron are not broken down by grades or prices. Defendant-intervenors assert Commerce should be instructed to find an alternative value for pig iron that reasonably represents the price of pig iron used by castings manufacturers and, in the absence of such information, to use best information otherwise available. *Domestic Industry's Comments on the Commerce Department's Remand Results ("Domestic Industry's Brief")* at 2–11.

Commerce asserts it provided adequate analysis and demonstrated its actions are in accordance with law and supported by substantial evidence. In sum, Commerce argues the record supports its findings. *Response of Defendant United States of America to the Domestic Industry's Comments on the Commerce Department Remand Results ("Commerce's Brief")* at 1–6.

■ This Court agrees. Commerce provided an extensive analysis of the record evidence available to value indirect and direct raw materials. Commerce properly treated pig iron and sand differently. The record reveals broad discrepancies in the import statistics values for sand which were due to the fact that the statistics reflected two dis-

tinct categories of sand, blasting and foundry sand. The record also reveals that the more expensive blasting sand was not used in iron castings production. In contrast, Philippine import statistic values for pig iron do not exhibit price discrepancies that are as broad and, to the extent different grades of pig iron imported may not have been used to produce castings, such variations are accounted for by the averaging inherent in the prices reflected in import statistics. *Remand Results* at 10–13, 22–25.

This case is distinguishable from *Sigma Corp. et al.,* 19 CIT at ————, 888 F.Supp. at 160–61, where domestic industry was able to show that Indian import statistics separated pig iron into two categories, only one of which is used to produce iron castings.

Finally, this Court has, in this case, already affirmed both the use of the Philippines as a surrogate country and the use of Philippine import statistics. *Sigma Corp.,* 17 CIT at ————, 841 F.Supp. at 1259–61.

Accordingly, this Court affirms Commerce's action on this issue.

### 5. *Freight-in Costs*

This Court remanded this case for Commerce to review its failure to include freight-in costs for procuring additives and supplies involved in calculating the raw material factors. *Sigma Corp.,* 17 CIT at ————, 841 F.Supp. at 1274.

On remand, Commerce considered whether freight-in costs were included in the figures provided by petitioners for additives and supplies. Commerce determined it is a generally accepted accounting practice to include all freight-in costs in the cost of raw materials entered into a company's inventory. Commerce stated it found no indication on the record that the prices used in petitioners' valuation of material costs did not include freight-in expense and, therefore, made no change to its calculation. *Remand Results* at 21.

Defendant-intervenors contend there are indeed indications on the record that the prices used in valuation of material costs did include freight-in expense. Domestic industry asserts petitioners separately included an amount for the freight-in expenses for these costs because their additives and supplies

information did not include freight-in expenses. Domestic industry supports their contention by pointing out that, if freight costs had been included, petitioners would not have had a separate line item for freight-in expenses for additives and supplies in its submissions. *Domestic Industry's Brief* at 11–13.

Commerce asserts it properly determined that the value of additives and supplies provided by petitioners included freight-in costs, thus precluding the addition of a further amount. Commerce states petitioners' separate line item for freight-in expenses does not necessarily apply only to additives and supplies. Commerce states petitioners intended the freight amount to be added to the price of each raw material factor of production. More importantly, Commerce found that at least some of the prices for other materials which petitioners claimed did not include freight were, in fact, priced on a delivered basis, therefore, including freight. Thus, Commerce states that, in light of record evidence that some material prices already included freight and of the general accounting practice to include all freight-in costs, it would be unreasonable to add an additional amount for freight to petitioners' price for additives and supplies. *Commerce's Brief* at 6–8.

■ Certain of petitioners' submissions do not indicate whether all of the prices provided for raw materials excluded freight; certain others do include freight. *Remand Results* at 25–26. Considering that Commerce cannot know why petitioners had a separate line item for freight-in expenses in its submission and that Commerce has already reexamined this issue pursuant to this Court's remand and found some evidence that freight was included in additive and supply costs, the Court defers to Commerce and affirms its action on this issue.

### 6. *Indirect Material Costs*

This Court instructed Commerce to reconsider the information submitted by petitioners regarding overhead costs, which includes both indirect materials and indirect labor costs, or to substantiate on the record why it should not, or to indicate in the record where these overhead costs were included. *Sigma Corp.,* 17 CIT at ————, 841 F.Supp. at 1272.

On remand, Commerce accounted for all the categories of overhead expense that were brought to its attention by the petitioners and used the methodology outlined in its analysis memorandum for the preliminary results of review. *Remand Results* at 16–18.

Domestic industry now asserts Commerce failed to account for complete indirect material costs in its overhead calculation. Domestic industry contends Commerce failed to rely on all indirect material cost information reported by petitioners and neglected to include costs for spare parts. Domestic industry requests a further remand so that Commerce can obtain additional information and, if none is forthcoming, to require Commerce to use best information available submitted by the petitioners. *Domestic Industry's Brief* at 13–15.

Commerce responds that it properly accounted for all indirect material costs in its overhead calculation pursuant to the Court's instructions. Commerce points out that the information submitted by the petitioners during the original proceeding established the category "additives and supplies," which represented a price for all materials other than pig iron, scrap iron, coke, bricks and aluminum. According to Commerce, the domestic industry is attempting to elude the consequences of its own data by asserting that it identified cost incurred for spare parts and including those costs under indirect material costs (as part of overhead). Commerce agrees that the figure for "additives and supplies" does not include spare parts, but asserts that spare parts are not indirect materials because they were not reported or demonstrated to be such and are not incorporated into the final product. *Commerce's Brief* at 8–11.

Commerce separated the components of its overhead expense calculation into the four standard accounting classifications and, on the basis of record evidence, concluded that its calculation of indirect materials, indirect labor, water, electricity and depreciation accounted for all of the categories of factory overhead expenses which either the petitioners or respondents were able to identify as occurring in the PRC during the review periods. Specifically, Commerce used petitioners' figures for additives and supplies to value indirect materials in the calculation of overhead expenses. *Remand Results* at 16–19.

■ Upon examination of the record, this Court finds that Commerce has reviewed the information on the record from respondents and petitioners and has ensured that its calculation of constructed value accounts for all indirect materials used in the production of iron castings. Commerce received information from respondents indicating that numerous additional materials were used in the production of castings, yet petitioners did not provide specific values for each material. Rather, they provided a figure which represented the cost of "additives and supplies," which Commerce used to value all other indirect materials enumerated by respondents. Also, respondents did not separately report spare parts and did not demonstrate that spare parts were incorporated into the final products. *Remand Results* at 27–30.

Accordingly, this Court hereby affirms Commerce's analysis and calculation of overhead expenses incurred by the respondents.

### 7. *Guangdong's Depreciation Expenses*

In the final results, Commerce used petitioners' depreciation estimate as best information available. Upon review, however, this Court found the use of best information available as improper because respondents' submissions were adequate, listing all assets and equipment and their date of purchase and stating the appropriate rates of depreciation for assets in the foundry. Accordingly, this Court ordered Commerce to recalculate the depreciation expenses using the actual information supplied by respondents. *Sigma Corp.*, 17 CIT at ——, 841 F.Supp. at 1269–70.

■ On remand, Commerce complied with this Court's remand instructions and recalculated the factors of production. Commerce found that if the Chinese equipment were depreciated according to the public version of the depreciation schedule submitted in the case of iron construction castings from India, the equipment would have been written off before the earliest review period began and the total depreciation expense is, therefore, zero. *Remand Results* at 9–10.

Domestic industry maintains Commerce should not have relied only upon the informa-

tion already on the record, but should have gathered additional information to calculate Guangdong's depreciation expenses. *Domestic Industry's Brief* at 15–18.

Commerce argues it properly adhered to the Court's instructions to calculate Guangdong's depreciation expenses based upon information already provided by Guangdong. *Commerce's Brief* at 12.

This Court agrees with Commerce's position. This Court deemed the respondents' submissions adequate to value depreciation expenses and specifically ordered Commerce to do so with the existing submissions. *Sigma Corp.*, 17 CIT at ———– ————, 841 F.Supp. at 1269–70. The Court stated: "[T]he Court deems respondents' submissions as sufficient and, therefore, this case is remanded to Commerce to recalculate the depreciation expenses using the information supplied by respondents." *Id.* at ———, 841 F.Supp. at 1270.

Therefore, this Court affirms Commerce's action on this issue.

### Conclusion

In accordance with the foregoing opinion, this Court, after due deliberation and a review of all papers in this action, hereby remands this case for Commerce to correct the error committed in calculating skilled labor costs of lathe operators, namely, for Commerce to multiply the machining time per metric ton by the production in metric tons of each foundry. In all other respects, Commerce acted in accordance with law and was supported by substantial evidence and this case is affirmed. Upon Commerce's correction of the error in skilled labor cost calculation as stated herein, this case is dismissed.

### JUDGMENT

Upon consideration of the Department of Commerce, International Trade Administration's ("Commerce") redetermination on remand filed in this case, *Iron Construction Castings from the People's Republic of China: Final Results of Redetermination Pursuant to Court Remand, Slip Op. 93–230* ("Remand Results"), and the Court having examined all comments filed in regard to the Remand Results, it is hereby

**ORDERED** that this case is further remanded to Commerce to correct the error committed in calculating skilled labor costs of lathe operators, namely, for Commerce to multiply the machining time per metric ton by the production in metric tons of each foundry; and it is further

**ORDERED** that, the Remand Results in all other respects having been affirmed by this Court, upon Commerce's correction of the error in skilled labor cost calculation as ordered above, this case is dismissed.